Mr. Han's trial should have been about whether $22.3 million that were given to him in 2010 were personal loans to him or business investments in his company and beyond. If those loans were personal or Mr. Han believed that they were, then he did not incur a tax deficiency in 2010 or 2011, the only tax years for which he was charged. Rather than remaining focused on that central factual dispute at trial, the government issued a broad-ranging attack on Mr. Han's character. This attack was based on arguments and evidence that originated in a fraud indictment originally charging Mr. Han with fraud dating back to 2004. Although those charges were dropped by the time of trial, the arguments and evidence were not. Which leads us to the District Court's three key errors below. The first was, the District Court permitted the government to introduce reams of character evidence about Mr. Han's uncharged conduct, most notably his expenditures and personal tax returns from 2004 to 2009. Second, the District Court permitted the government to invoke the rhetoric of class prejudice to paint Mr. Han as a serial fraudster and a profligate spender, a multimillionaire living a life of luxury who should be held accountable for his spending. And third, the District Court erred by modifying Mr. Han's requested theory of the defense jury instruction to remove the crux of his defense, that Mr. Han believed that the 2010 transfers were non-taxable personal loans. This failure of proper instruction further increased the likelihood that the jury did exactly what the government wanted it to do, look to evidence of Mr. Han's past misconduct, outrageous expenditures, and conclude he must be guilty of something. Because the government cannot meet its burden to show that the difference between the trial that was and the trial that should have been was harmless, Mr. Han's conviction must be vacated. But even if this court is not prepared to vacate Mr. Han's conviction at this time, the appropriate course would be to remand to the District Court for an evidentiary hearing on Mr. Han's ineffective assistance of counsel claim. At trial, defense counsel opened the door to testimony Mr. Han had been held liable in a substantially related civil suit. This court's usual practice when a colorable claim has been raised is to move the case back down to the District Court who is closer to the facts and can make a better assessment about whether the ineffective assistance counsel threshold has been met. I would like to begin by talking about the improperly admitted evidence. So, at trial and before trial, defense counsel repeatedly objected to evidence of Mr. Han's expenditures from 2004 to 2009 coming in. Why is the government's explanation that that history of what happened from 2004 to 2009, so not just the expenditures but a complete story that came in, these expenditures? And then being told by his accountant, you either have to take those as, report them as your own taxes, or have them, they're not business expenses, and so then you're going to have to treat them as payment to you and your own taxes, you're going to have to report it, or you're going to have to make it a loan from the company. And so, having made those expenditures, and understood the difference between personal and corporate expenditures, and having been told you're going to have to call it, make it a loan, or you're going to have to declare them as income, then 2010 comes around, and there's a change in his approach, and he does this personal loan approach. Why doesn't that story fit the 404 rules on both plan, preparation, knowledge, and intent? So Judge Millett, first I want to clarify that in this court, there's no general complete the story exception to either intrinsic evidence or what counts as 404. So the government does need to make a pretty specific connection of what the relevance of this evidence would actually be to things he was charged for in 2010 and 2011. No, but I think it's, I'm not talking about completing the story of the crime, I'm sort of explaining how he did, why he did the crime the way he did. It evidences his plan and preparation, knowing that this happened one time, and he learned this information, had these consequences, and then shifts strategies. It's almost like it's the instruction manual for how to do it in 2010 and 2011. Well, Your Honor, we think the government's trying to have it two ways of it here, which is that when they're looking to 2010 and 2011, and they want to calculate his tax deficiency, they look back to the 2004 and 2009 period, and they say, look, there were these shareholder loans. That was a debt Mr. Hahn took out. When he repaid those in 2010 and 2011, that created a deficiency in 2010 and 2011. Had he been committing tax evasion in 2004 to 2009, if he had been doing something improper at that point, there were no shareholder loans, he wouldn't have incurred a deficiency in 2010 and 2011 by repaying them. There would be nothing to repay. So we think the government, there's a disconnect between the conduct that he was alleged to have... There's no dispute that he had, as of 2010, he had roughly $7 million in shareholder loans. Well, Your Honor, that's actually the main basis upon which the government argues that this evidence from 2004 to 2009 should have come in. The brief, they say, this evidence was intrinsic to the charged tax events in 2010 and 2011, because it showed the existence of those earlier shareholder loans. It also created the information he learned from his accountants during that time about when you have expenditures like this, what are your options for avoiding taxes? And he sort of changed when it came to 2010 and 2011 and tried this personal loan rather than loans to the company approach. It seems to me it's relevant to the plan and preparation, his intent and knowledge, and I'm not sure how the government's trying to have its cake and eat it, when you think of it through that lens. So, let's focus there on the change of plan. Basically what the government is suggesting is that Mr. Ahan engaged in some sort of improper course of conduct in 2004-2009, and that led him to engage in this change of conduct, some different course of conduct in 2010-2011. That's illustrating the disconnect between the two things that are alleged. In 2010, it's that he apparently hid an investment from these two individuals, used that solely for his personal purposes, and didn't report it on his taxes. What's being claimed for 2004-2009 was that he was using the company... He didn't hide it, it was a personal loan, there was paperwork and it was a personal loan. That was his theory, that he had the paperwork and it was a personal loan, and he didn't report it because he viewed it as a personal loan. Yes, that is the defense's submission. The government's argument was that he was hiding these funds from his company, pretending that they were personal loans, masquerading them as personal loans where they were actually business loans. It's a very different set of conduct than he was alleged to have engaged in for 2004, or suggested that he engaged in 2004-2009. No, the very difference is the point that makes it relevant. That he sort of got more information, learned from the accountants how to do this, and tried a new tactic then. That doesn't work for you. Your Honor, we would submit that there needs to be a closer connection, especially when we're looking at how much evidence came in and how prejudicial it was. So, we look at the actual evidence here, we have two witnesses talking about, in detail, Mr. Hahn's car purchases in 2004-2009. His three BMWs, his three Porsches, his Mercedes. The government recapitulates this during its closing, it puts an exhibit before the jury showing the price of those cars. It's unclear how any of that is supposed to ultimately relate to an intention in 2010 to re-characterize a business loan as a personal loan. The connection is so attenuated, and when the prejudice is so obvious, that runs into a 403 problem. And the prejudice that runs from that improper admission was exacerbated by the way the government talked about it. Repeated indications to his luxury lifestyle, his living the life of a millionaire, he had a problem with spending. It was clear this was part of the government's overall presentation and strategy of trial, rather than a narrow focus on the actual tax charges alleged. When we look at that prejudice and this evidence that was coming in improperly, I think it's also important to look at the jury instructions here. So, Mr. Hahn had asked for an instruction that said he reasonably believed, not that he reasonably believed, sorry, that he believed that the funds he received in 2010 could legally be treated as non-taxable personal loans. As the government concedes, the district court's basis for striking that, that Mr. Hahn did not testify, was erroneous. And this is the basis of Mr. Hahn's presentation at trial. When this instruction was removed, the jury was essentially instructed, Mr. Hahn relied on his tax advisors for advice. Mr. Hahn had a good faith mistake about the requirements of the law. But they were never instructed where Mr. Hahn had a good faith mistake about the requirements of the loan.  That was the argument of the defense in the closing, wasn't it? Which was, Your Honor? The theory of the defense. Yes. That was the theory of the defense and it was raised in the closing argument. That's correct, Your Honor. So we have an error in the instruction. The question is, the judge is not expected to endorse the defendant's theory, only to state the defendant's theory. So it was an error to not state the defendant's theory. Nonetheless, it was quite clear throughout the whole trial what the defendant's theory was. So what's the harm? So the harm is that the jury is now, it's heard the evidence, it's heard the arguments, it's now given the form it's going to look at when deciding whether Mr. Hahn is innocent or guilty. It has the government's theory. It has the charges laid in front of it. What it doesn't have is the crux of what Mr. Hahn is actually saying. But it does. It has it in the form of the defense counsel's closing argument. And there doesn't seem to be a dispute at all that if it really were alone, or if he thought it were alone, that it would be in defense. So, yes, the judge erred. The question is, what's the harm? Well, Your Honor, we would take issue with the idea that defense counsel arguments are the same thing as jury instructions. They're not the same thing. That's why it's an error. But the question is, is it a harmful error? And since the government wasn't disputing that that's the theory of the defense, nobody has to endorse the theory of the defense other than the defense. So what's the harm as long as the jury understands this is the theory of the defense? And the only way that this would be a problem is if you think the closing argument was also ineffective assistance of counsel.  I read it. I don't have any concern about that. You didn't raise that. No, no, Your Honor, we're not arguing that the closing itself was ineffective. But what we're trying to say here is this is a seven-day trial, complicated charges. The jury saw all of this improperly admitted evidence of Mr. Hahn's past misconduct, throwing his character into question. And then they weren't, at the end, instructed on what would actually form the crux of his basis for a reasonable doubt, which is that he believed that the loans themselves were non-taxable personal loans. All right, Ms. Hart-Mahan. May it please the Court, Alyssa Hart-Mahan for the United States. The central question in this case was whether the $22.3 million that Frank Carlucci and James Russell provided in 2010 was a personal loan to the defendant or a business investment in NBN. The record makes clear that that was the issue the parties were focused on. The closing arguments make clear that that was the issue the parties were focused on. And the jury convicted not because of any evidentiary errors or errors in the instructions, but because the evidence was overwhelming that that $22.3 million was an investment in NBN. In fact, the defendant himself admitted on at least two separate occasions that it was an investment in NBN. In the global promissory notes that he drafted and provided to Carlucci and Russell, he explicitly stated that the $22.3 million was a debt of NBN, that NBN had a duty to repay those funds to the investors. And in the stipulation that was entered into evidence regarding the civil lawsuit, in his response to the Carlucci complaint, the defendant represented that Carlucci provided $20 million to NBN in 2010, and that Michael Hahn, the individual, was not a party to the global promissory note. I would submit that those admissions alone tipped the balance here to make it clear that those funds were a business investment and not a personal loan to the defendant. Now, the government still had to prove all the elements of tax evasion here, including the existence of a tax deficiency, the fact that the defendant acted willfully, and affirmative acts of evasion. And the evidence of defendant spending, both in 2004 through 2009, and in 2010 and 2011, and the tax returns in the earlier years, was highly relevant to those other elements, both the existence of a tax deficiency. The government had to prove that his payment of the $7 million in shareholder loans was a personal expenditure that created income to defendant in 2010 and 2011. And in addition, it was highly relevant to the defendant's state of mind. He consulted with an accountant about how to characterize the expenditures in the earlier years, and the accountant advised him, you either have to treat it as taxable income or a shareholder loan. The shareholder loans were reported to the IRS on NBN's corporate returns, which were filed, I would note, in 2010 at the same time the charged conduct is occurring. And the way that the defendant handled the $22.3 million that he received in 2010 demonstrates that he knew this was not a shareholder loan and that it was not a personal loan. He put it in a hidden personal account. He did not disclose it to his employees or his accountants, and he took other steps to conceal the funds from people who might include it on the corporate books. The evidence from 2004-2009, usually when a 404B evidence is used for a limited purpose, it's introduced and treated in a limited way by prosecutors. But here, the stories, the pictures, the pie charts, there was the arguments. There was exceptional emphasis on these expenditures and how over the top they were, how unlike anything anyone normally would spend, the numbers of cars and these types of things. It was emphasized pretty heavily if it's just being used as evidence to help understand the intent, knowledge, planning of Mr. Hahn. Would you agree that there was at least – you don't have to agree it's prejudicial. I wouldn't expect you to at all. But would you agree that the use of that evidence was beyond what it should have been? No, I would not agree with that. The evidence did come in, and the prosecutors did reference it. Well, they did more than just reference it. I mean, you'd have to agree with the jury over the head with it. I think it's important to distinguish between the 2004-2009 expenditures and then the expenditures that occurred largely in 2011 that directly involved the $22.3 million. And that involved the home in Florida, the renovations to the home in Florida, and numerous other sports cars that were purchased. Now, the defendant did not object to the admission of the 2010 and 2011 evidence, and that was clearly intrinsic evidence that was crucial to proving a tax deficiency in the charged years. The 2004-2009 evidence was actually – I mean, the defendant attempts to characterize it as reams and reams of evidence, but it was actually fairly limited. It came in through the testimony of primarily Terry Crowder, who was the bookkeeper, who was brought in to reconstruct the corporate books and records in 2004 and 2010 – excuse me, 2009 and 2010 in preparation for filing the delinquent corporate tax returns. And we included her testimony in our supplemental appendix. I think it's about 20, maybe 30 pages of transcript. And most of that was – she's talking about the expenditures, but she's also talking about her back and forth with the defendant and with the other accountants working on the case about the difference between personal expenditures and business expenditures, how to characterize them on the tax returns. And so there was discussion of sports cars and other expenditures, but this was a seven-day trial. And we have one witness. Now, a couple of other witnesses did reference that. You had the FBI agent who sort of did a forensic analysis of the funds coming into the company. But his testimony, again, was focused on that $22.3 million and tracing the $22.3 million into the defendant's account and then where that money ended up. And, again, that was part of the government's case in chief was intrinsic to the charged offenses. So I don't think it was quite as widespread as the defendant would have you believe. I think a full review of the record. So are you saying that 2004-2009 was intrinsic? That is – we think it was intrinsic to prove the deficiency. How is it contemporaneous and how is it the expenditures? How are they contemporaneous and how do they facilitate? The expenditures themselves were not contemporaneous. But Terry Crowder's testimony about her review of the bank records and her discussion with the defendant about how to characterize those expenditures was contemporaneous. That was occurring in 2010, and the corporate tax returns for the earlier years were filed in the fall of 2010. The prosecutors weren't arguing about her testimony. They were arguing about the expenditures. Well, and they were arguing that those shareholder loans were personal expenditures and that when the defendant then used $7 million of the $22.3 million to pay off those shareholder loans, that created income to the defendant, which resulted in a tax deficiency for the charged years. In any event, the district court relied on 404B to admit that evidence, and it was clearly admissible under 404B to show the defendant's state of mind, to show his plan, to show that this was not a mistake. This was a deliberate choice that the defendant made to conceal the funds and to conceal his personal use of the funds. I think the testimony of his then-wife is particularly telling. He told her, hey, I got $20 million from Carlucci. It was a sale of my equity, so I can do whatever I want with the money. And he asked her, he specifically asked her, can you let me know what the tax consequences would be if this were a sale of equity? And there was an email that she testified about at trial where she said, well, if it were a sale of equity, the tax liability would be approximately $3 million, whereas if it was ordinary income to you, it would be $8 million. And he acknowledged receipt of that email. He was on notice that this money, that when he used that money for personal purposes, there were tax consequences. Was the point of showing the extravagance of the expenditures to show that they could not have been corporate expenditures, that they were personal? Yes. And the government's expert witness who testified about her deficiency calculations made that clear. In order to be deductible as a business expense, it must be an ordinary, unnecessary expense. And, you know, a $226,000 Ferrari is not an ordinary, unnecessary expense. And the government also introduced all these lavish expenditures that it said it was not counting as personal expenditures just to show how considerate and restrained, conservative it was being. It doesn't strike me as appropriate for the government to throw in a bunch of evidence that says, look at all these other things that we think will offend the jury that we're not charging. How can that possibly be justified? What happened here was the FBI agent who did the forensic analysis of the funds, again, testified about his analysis of the $22.3 million, how it went into the defendant's personal account, and then he traced it to various destinations, some of which the government treated as income to the defendant, some of which the government said these could have been business expenses, so we are not going to treat them as income. And the government made clear that its theory was not that the $22.3 million in its entirety was income to the defendant. The government's theory was this was a business investment, and it became income to the defendant when he misappropriated those corporate funds and spent them for personal purposes. So much was made about the expenditures on private jet and travel in the defendant's brief. But it was clear from the record that some of that travel was business-related. There was testimony that the defendant went to Brazil to attempt to negotiate a deal with a Brazilian company. Rather than going through and saying, okay, this travel expense was business, this travel expense was personal, the government conceded, hey, if he's spending this money on business expenses, then it's not income to him. He's using the money as it was intended by the investors. So it was part of the government's case to prove that. And the exhibit summarizing that speaks in broad categories. To prove that he had some legitimate business expenses that was part of your case? To show the calculation of the tax efficiency. So to distinguish between, okay, these are personal expenses that are income to him, and then this money could have been for a business expense, so we're not going to include it in our calculations. If the court has no further questions, we ask you to refer. Thank you. Does Mr. Baggin have any time left? Why don't you take two minutes? Thank you very much. A few quick points I'll try to address here. It would be awfully convenient that the only way to show the conservative nature of your calculation is to repeatedly mention Tripp's private jet travel to the Caribbean, which is what the government did during both its closing arguments and in its examination of the IRS witness. But what I really want to talk about here is that a lot of the presentation you just heard was about the evidence being overwhelming. I want to talk a bit about why we're not dealing with harmless error in this case. So the actual loan, what really matters here, the government said it, we've said it, is whether these 2010 transfers were personal or business. They say on them, to Michael Hahn, the individual. The word and beyond never appears on the notes anywhere. Both the IRS, both the government's witness and the defense's witness at trial said, on the face of those notes, they're personal. The defense witness, also as a CPA with decades of experience, said he would not have reported them. What about the stipulation in the civil suit? So, Your Honor, we're not suggesting that the government hasn't put forth any evidence that shows a contrary position, but again— Well, it's not just a contrary position. It's an admission under oath against interest by the defendant in the case. I admit this was not a personal loan. I mean, that would seem to end the case by itself. Well, Your Honor, what matters for the purposes of assessing whether something's a personal or business loan is the intent at the time of the parties. And the jury could have looked to, well, what did the parties actually agree to, not what did Mr. Hahn say in the context of a civil suit a year and a half afterwards. And in addition, the stipulation is a bit confusingly worded. It says that $20 million were invested and beyond, and then it also says to the extent that the allegations purport to characterize that note, they speak for themselves. The defense witness was asked about that note, and his perspective was still that he thought there was a reasonable basis given. Well, that's the expert who wasn't there at the time and doesn't know what happened at the time. And as you point out, the issue is what happened at the time. And it seems like the defendant is most knowledgeable about that. And when he then had to recharacterize this or characterize this more clearly in the global note, he did again. And the real question about the previous time was whether he was pulling one over on somebody who obviously had dementia. So the fact that it's named in the note, when the person who actually got it and his wife thought that this was really for the company, that hardly establishes the point. It's a question of whether he's taking advantage of somebody who thinks he understands what's going on. So, Your Honor, if I could quickly address that. What that really gets into, again, are the fraud charges that were dropped. The government originally alleged a vast number of misrepresentations that Mr. Hahn had made. I understand that could have been part of the fraud, but it could also be part of the tax evasion. Your Honor, we don't think so. We don't think it goes to the question of whether those were personal or business loans, which is the question at issue here. If the people who made the loans thought that they were business loans, that goes to the question of whether they were business loans. That goes to the question, and so does Mr. Hahn's belief. And so does Mr. Hahn's belief. Mr. Hahn's belief. So if Mr. Hahn believes they're personal loans, We don't know really what – we're no longer on the question of what was the evidence and whatever the judge decided on the question of the instruction. But we don't know what Mr. Hahn's belief is other than the evidence that came out, including what he said under oath. So, yes, we have both what he said under oath, and then we also have the loans themselves and what they say. And it's the government's burden to show beyond a reasonable doubt that Mr. Hahn committed that offense, given the documentary evidence he put forward. We submit with the errors that were committed at trial. The government can't show the errors on us. Can I ask you a question? Sorry, one quick question on your request for a remand on ineffective assistance of counsel. What additional facts need to be found to examine prejudice? To examine the prejudice? Right. Because there doesn't seem to be much factual dispute about what happened at trial that you call ineffective. And so what facts as to prejudice, or if you think you need more facts? What's the point of the remand? What facts need to be developed? So, Judge Millett, it's correct that the government doesn't really contest that performance was even deficient. But unless the record conclusively establishes that the claim fails, it's this court's practice to let the district court take the first look at that. Well, you have to show both ineffectiveness and prejudice. And so I'm trying to figure out what the – if you think the record is clear now on both those factors, we wouldn't need a remand. We could just decide it. But it's not – there must be something that you think is unclear in the record that needs to be developed more to have a remand, right? Well, Your Honor, defense counsel could try to explain if there was a strategic basis for that decision. That could come out. And in terms of establishing the prejudice, it is the district court who was there during the entire proceeding and conducted it who's in a much better position to review prejudice. And that's why district courts decide these claims in the ordinary course. Thank you, sir. Counsel, you were appointed by the court, and we thank you for your very able assistance. Thank you very much.
judges: Henderson, Garland, Millett